

KATHLEEN G. KANE
ATTORNEY GENERAL

**January 9, 2015**

Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone (717) 783-1471
Fax (717) 772-4526
mlewis@attorneygeneral.gov

_ONLY VIA ELECTRONIC CASE FILING_
**The Honorable John E. Jones III**
**228 Walnut Street**
**P.O. Box 983**
**Harrisburg, Pennsylvania  17108**

Re: _Disability Rights Network of Pennsylvania v. John Wetzel_
No. 3:13-CV-00635 (M.D. Pa.)

**Dear Judge Jones:**

Undersigned counsel write to inform the Court that the parties executed a Settlement Agreement in the above captioned matter on January 5, 2015. In accordance with the Agreement, the parties are to file a Stipulation of Dismissal within twenty (20) days of the execution of the Agreement. Attached for the Court's information is a copy of the Settlement Agreement. Counsel jointly determined that the Court should be informed of the Agreement prior to the filing of the Stipulation. The Agreement provides for the dismissal of this matter without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and retention of limited jurisdiction by the Court solely to enforce the Settlement Agreement pursuant to Paragraphs 69 and 70 of the Agreement.

The parties request a conference with the Court to address concerns regarding the language in an order dismissing the case without prejudice. The parties appreciate the Court's continued assistance in this matter and look forward to a conference with the Court.

**Respectfully,**

*s/Robert W. Meek*
**ROBERT W. MEEK**
**Disability Rights Network**
**of Pennsylvania**
**1315 Walnut Street**
**Suite 500**
**Philadelphia, PA 19107-4705**
**Phone: (215)-238-8070**
**Fax:     (215) 772-3126**
**rmeek@drnpa.org.**
**Counsel for Plaintiff**

*s/ Maryanne M. Lewis___*
**MARYANNE M. LEWIS**
**Senior Deputy Attorney General**
**Office of Attorney General**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**Phone: (717) 787-9719**
**Fax:     (717) 772-4526**
**mlewis@attorneygeneral.gov**
**Counsel for the Defendant**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DISABILITY RIGHTS NETWORK OF PENNSYLVANIA** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Civil Case No. 1:13-CV-00635** |
| | : | |
| **JOHN WETZEL** | : | |
| | : | |
| **Defendant** | : | |

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

## INTRODUCTION

**WHEREAS**, on March 11, 2013, Plaintiff filed this lawsuit, on behalf of inmates with serious mental illness who are in the custody of the Pennsylvania Department of Corrections (DOC), alleging, *inter alia*, that Defendant violated the Eighth and Fourteenth Amendments to the United States Constitution by segregating inmates with serious mental illness in Restricted Housing Units (RHU). Defendant expressly denies that he has violated any such constitutional rights.

**WHEREAS**, Plaintiff has conducted an investigation of the conditions of confinement of such inmates with serious mental illness and has obtained many policies, directives, inmate medical and disciplinary records, and other pertinent materials.

**WHEREAS**, Defendant has provided, through counsel, further documents set out in requests made by Plaintiff, and Plaintiff's experts have conducted on-site tours of several State Correctional Institutions and made recommendations concerning the definition of

"serious mental illness," staffing ratios for units providing mental health services to inmates, issues concerning programming in such units, and other relevant issues.

**WHEREAS**, Plaintiff and Defendant, without conceding any infirmity in their claims or defenses, and prior to conducting formal discovery, have engaged in extensive settlement negotiations to resolve the claims raised in this litigation and desire to reach an appropriate remedy to resolve this litigation amicably to avoid the risks and expense of further litigation and provide for relief based on constitutional principles.

**WHEREAS**, the Parties acknowledge that the DOC and Defendant have implemented improvements and that the improvements have been ongoing throughout the litigation and independently thereof. The DOC and Defendant voluntarily began implementing and voluntarily continued thereafter to implement the improvements and processes described herein independent of this lawsuit.

**WHEREAS**, Defendant is entering into this Settlement Agreement and General Release (hereinafter "Agreement") for the purpose of settlement and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law or regulation, or of any other matter of fact or law, or of any liability or wrongdoing (including allegations of the Complaint), all of which the DOC and the Defendant expressly deny. The DOC and the Defendant do not admit to any violation of law, and do not admit to any wrongdoing that was or could have been alleged by the Plaintiff before the Effective Date of this Agreement. No part of this agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Defendant, the DOC and/or the Commonwealth of Pennsylvania.

**WHEREAS**, this Agreement is made without trial or adjudication of any issue of fact or law or finding of wrongdoing or liability of any kind. It is the intent of the Parties that this Agreement shall not be binding or admissible in any other matter, including, but not limited to, any investigation or litigation initiated by the Plaintiff after the Effective Date of this Agreement.

**WHEREAS**, it is also the intent of the Parties that no part of this Agreement shall create a private cause of action or confer any right to any third party for violation of any federal or state statute.

**NOW, THEREFORE, IT IS HEREBY AGREED** by and between the Parties, as follows:

<u>**DEFINITIONS**</u>

1. As used in this agreement, the following terms have the following meanings:

   a. **"A Roster"** refers to inmates that have no currently identified psychiatric/Intellectual Disability needs and no history of such.

   b. **"Administrative Custody"** and/or **"AC Status"** refers to a status of confinement in segregated housing units for non-disciplinary reasons, which provides closer supervision, control and protection than is provided in general population.

   c. **"B Roster"** refers to inmates placed on the inactive MH/ID roster, but not currently identified as SMI. Inmates on this roster have a history of psychiatric/Intellectual Disability needs, but are not current consumers of mental health services.

   d. **"C Roster"** refers to inmates placed on the active MH/ID roster, but not currently identified as SMI.

e. **"D Roster"** refers to a list of inmates on the active MH/ID roster who have SMI as defined herein.

f. **"Defendant"** refers to John Wetzel, Secretary of the Pennsylvania Department of Corrections.

g. **"Department" and/or "DOC"** refers to the Pennsylvania Department of Corrections.

h. **"Diagnostic and Classification Center/Facility" and/or "DCC"** refers to an area within a facility which assesses custody, security levels, programmatic and special needs of inmates who are newly received into the Department, returned as parole violators, or temporarily transferred for presentence assessment.

i. **"Disciplinary Custody" and/or "DC Status"** refers to the maximum restrictive status of confinement to which inmates found guilty of a Class I misconduct may be committed.

j. **"Diversionary Treatment Unit" and/or "DTU"** refers to a secure unit that provides expanded and personalized mental health services to inmates with a SMI who have committed disciplinary infractions

k. **"Effective Date"** refers to the date by which all Parties have executed this Agreement.

l. **"Exceptional Circumstances"** refers to a circumstance when the DOC lacks an appropriate alternative placement (e.g. DTU or SRTU) for an SMI inmate sanctioned with disciplinary custody time due to a lack of bed space; due to a new SMI diagnosis that requires transfer to a different facility; or an institutional

emergency under which an act otherwise required by this Agreement would create an unacceptable risk to the safety of any person.

m. **"Facility Manager"** refers to the Superintendent of a State Correctional Institution (SCI).

n. **"Forensic Treatment Center" and/or "FTC"** refers to the forensic psychiatric hospital operated by the Department. The unit is currently located at SCI-Waymart and its operation is guided by the Regulations for Inpatient Forensic Psychiatric Hospitals, Chapter 5333 of Title 55, published by the Office of Mental Health.

o. **"Individual Recovery Plan" and/or "IRP"** refers to a series of written statements specifying the particular course of treatment that an inmate will receive and the roles of staff in carrying it out. It is based on a recovery model which includes an assessment of the inmate's needs, a statement of goals that are intended to address those needs, as well as the methods by which these goals will be pursued. When clinically indicated, the recovery plan provides inmates with the range of supportive and rehabilitative services that are clinically appropriate for the inmate. The inmate is involved in the development of the plan, and the inmate will be encouraged to sign the IRP. The inmate's refusal to sign the IRP will be documented.

p. **"Licensed Psychology Manager" and/or "LPM"** refers to a Civil Service Title for the Chief Psychologist within a facility.

q. **"Mental Health Professional"** or **"MHP"** refers to psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, therapeutic recreational services

workers, and others who by virtue of their education, credentials and experience are permitted by law to evaluate and care for the mental health needs of inmates.

r. **"Mental Health Unit" and/or "MHU"** refers to an approved Department of Public Welfare, Office of Mental Health mental health unit housed within a Department facility. Vendors under contract with the Department operate these units. The Regulations for Inpatient Forensic Psychiatric Programs, Chapter 5320 of Title 55, published by the Office of Mental Health, guide the operation of these units.

s. **"Parties"** refers to the Plaintiff and the Defendant in the lawsuit captioned above.

t. **"Plaintiff"** refers to the Disability Rights Network of Pennsylvania (DRN), a non-profit organization designated by the Commonwealth of Pennsylvania pursuant to the federal Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801-07 (PAIMI Act), to advocate and protect the rights of individuals with mental illness, including inmates with serious mental illness in State Correctional Institutions.

u. **"Program Review Committee" and/or "PRC"** refers to a committee consisting of a Deputy Superintendent, who will serve as the chairperson; at least one of the following staff members: Inmate Program Manager, Unit Manager, School Principal, Drug and Alcohol Treatment Specialist Supervisor, or Inmate Records Officer; and a Commissioned Officer; with clinical input from a member of the psychology staff. The Facility Manager may designate other staff as committee members, however, if such designations are made, they will be in writing. The Facility Manager will maintain a list of all designees. Whenever a PRC is

convened, at least one (1) member will be a staff member who is not directly involved in the administration of the unit in which the inmate is currently housed.

v. **"Psychological Evaluation"** refers to a comprehensive mental health evaluation conducted at the DCC.

w. **"Psychiatric Observation Cell" and/or "POC"** refers to a cell located in the infirmary area of the facility that is used to hold inmates who are mentally decompensating to the point where they are considered an imminent danger to themselves, other inmates, and/or property.

x. **"Psychiatric Review Team" and/or "PRT"** refers to a team, chaired by the facility's Chief Psychologist/designee that includes the Consulting Psychiatrist, Unit Manager, and other staff designated by the Facility Manager.

y. **"Recent Significant History"** refers to an inmate entering the custody of the DOC diagnosed with a Serious Mental Illness within the past twelve (12) months by a psychiatric provider or who was admitted to an inpatient setting within the six (6) months preceding DOC custody.

z. **"Residential Treatment Unit" and/or "RTU"** refers to a General Population unit that houses active mental health roster inmates that are in need of enhanced mental health services, and who are otherwise eligible as determined by the PRT.

aa. **"Restricted Housing Unit" and/or "RHU"** is a segregated housing unit used by the DOC to house inmates placed in Disciplinary and Administrative Custody. Inmates housed within this unit are confined to their cell for a minimum of 23 hours per day, 7 days a week.

bb. **"Secure Residential Treatment Unit"** and/or **"SRTU"** refers to a secure housing unit designed to provide management, programming, and treatment for active mental health roster inmates who are a threat to the safety and security of staff and other inmates in a less secure environment.

cc. **"Self-harm"** refers to the deliberate, intentional, direct injury of body tissue that requires outside hospital treatment (whether admitted or not) or that requires DOC medical intervention or treatment (i.e., not simply an evaluation), including for any lacerations that requires sutures, any event that requires oxygen administration, any event that requires an infirmary admission, or any event that requires stat medication administration. Such acts include but are not limited to the following behaviors: hanging, self-strangulation, asphyxiation, cutting, self-mutilation, ingestion of a foreign body, insertion of a foreign body, head banging, drug overdose, jumping, and biting.

dd. **"Serious Mental Illness"** and/or **"SMI"** refers to:

    i. Inmates determined by the Department's Psychiatric Practitioner and supported by the Psychiatric Review Team (PRT) to have a current diagnosis or a Recent Significant History of any of the following DSM 5 diagnoses: schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, brief psychotic disorder, substance-induced psychotic disorder (excluding intoxication and withdrawal), psychotic disorder not otherwise specified (NOS), major depressive disorders, bipolar I and II disorders, or

    ii.  Inmates diagnosed by the Department's Psychiatric Practitioner with a serious personality disorder that is manifested by breaks with reality, or perceptions of reality, that lead the individual to experience Significant Functional Impairment, or

    iii.  Inmates diagnosed by the Department's Psychiatric Practitioner with Intellectual Disability (Intellectual Development Disorder) or an Amnestic or other Cognitive Disorder (Neurocognitive Disorder) that result in a Significant Functional Impairment.

    iv.  Inmates whose diagnosis qualifies them as having a Serious Mental Illness consistent with the above-definition will be placed on the D Roster. Any inmate meeting the diagnostic criteria of Serious Mental Illness consistent with the above definition shall continue to be on the D Roster notwithstanding the inmate functioning appropriately due to the provision of appropriate treatment and medication.

ee. **"Significant Functional Impairment"** - the factors for consideration when assessing significant functional impairment include the following, the presence or absence of which is a clinical judgment determined by a psychiatrist/PCRNP:

    i.  the inmate has engaged in Self-harm or a credible threat of Self-harm;

    ii.  the inmate has consistently demonstrated difficulty in his or her ability to engage in activities of daily living, including eating, grooming and personal hygiene, maintenance of housing area, participation in recreation, and ambulation as a consequence of any diagnosis set out in the definition of Serious Mental Illness, above; or

iii.  the inmate has consistently demonstrated dysfunctional or disruptive

social interactions including withdrawal, bizarre or disruptive behavior,

etc. as a consequence of any diagnosis set out in the definition of Serious

Mental Illness, above.

ff.  **"Structured Out-of-Cell Time"** and/or **"Structured Activity"** refers to the time

inmates with SMI are provided certain services and programs out of their cells.

Out-of-cell services and programs will be offered to SMI inmates in the most

appropriate setting based upon the inmate's security needs.   Structured time

includes mental health programming, programming required for parole,

education, activity groups and other programming led/facilitated by a credentialed

Department or contracted staff member or a volunteer.  Structured Activity will

include the provision of the following services: 1) implementation of an IRP; 2)

appropriate therapeutic intervention; 3) individual therapy or counseling; 4) group

therapy; 5) coping skills development; 6) medication education; 7) mental health

activity therapy; and/or 8) substance abuse treatment if clinically appropriate.

gg.  **"Transition Period"** refers to the period of time from the Effective Date of this

Agreement to July 1, 2016, or the period of time from the Effective Date of this

Agreement to the time of notification from the DOC that the transition period has

ended, whichever occurs sooner.

hh.  **"Unstructured Out-of-Cell Time"** and/or **"Unstructured Activity"** refers to

time inmates with SMI are permitted to be outside of their cells to engage in

leisure activities that are not led by a Department staff member.  Out-of-cell

services and programs will be offered to SMI inmates in the most appropriate

setting based upon the inmate's security needs. Unstructured time may include law library, recreation, visits, viewing movies, eating in small groups, and reading out-of-cell. Unstructured time does not include activities of daily living, e.g. showers.

### SCREENING AND DEVELOPMENT OF IRP AT DCC RECEPTION

2. Every inmate entering the custody of the DOC will be given a Psychological Evaluation for the purpose of, among other things, determining whether the inmate has SMI, within seven (7) days of admission, or sooner, if clinically appropriate, to be conducted at the Diagnostic and Classification Center (DCC). Every effort will be made to conduct such assessment within seventy-two (72) hours where the inmate is known to have mental illness or there are observed symptoms of mental illness.

3. Within seventy-two (72) hours of this assessment at the DCC, any concerns by DOC staff about the mental health of the inmate or indication that the inmate may have SMI will be made on a Mental Health Referral Form to the LPM. In cases in which the mental health of the inmate presents serious risk of harm to the inmate or others, there should be an immediate referral to the psychology staff.

4. An inmate with evidence of SMI will receive a comprehensive psychiatric evaluation conducted by a psychiatrist or Certified Nurse Practitioner – Psychiatric Services (PCRNP) within fourteen (14) days after receipt of the Mental Health Referral Form or sooner, if clinically appropriate. The purpose of this evaluation is to determine whether the inmate has SMI and to determine the appropriate recommendations for the inmates IRP.

5. For inmates diagnosed with SMI, the PRT will generate an IRP within twenty (20) days of the determination that the inmate has SMI that will accompany the inmate to the

receiving facility. From the Effective Date of this Agreement, all inmates with SMI will receive clinically appropriate mental health care that is consistent with their IRP and all clinical contacts will be documented.

6.    If at any time an inmate has been determined to have SMI, including at DCC Reception, the provisions of this Agreement pertain to that inmate, including, but not limited to placement, privileges, and mental health treatment.

## HOUSING OF INMATES WITH SMI

7.    After the end of the Transition Period, no SMI inmate will be placed in an RHU absent Exceptional Circumstances that prevent placement of the inmate in a DTU, SRTU, RTU or other appropriate unit. In the event of such a placement in an RHU, the Department must timely notify Plaintiffs' counsel of the reasons and expected duration of the placement. Placement of SMI inmates in the RHU will be no longer than the duration of the Exceptional Circumstances. In no event will the placement in the RHU exceed thirty (30) days, and for that period of time, the inmate will be afforded the same privileges available to inmates in the DTU including ten (10) hours of Structured Out-of-Cell Time and ten (10) hours of Unstructured Out-of-Cell Time per week.

## RESIDENTIAL TREATMENT UNITS

8.    RTU housing will be provided to inmates on the active MH/ID roster who require a residential level of specialized mental health care to facilitate their return to outpatient treatment, if clinically appropriate.

9.    Inmates on the active MH/ID roster in general population who have difficulty adjusting to general population may be housed in a RTU for as long as it is clinically determined that such a level of mental health care is necessary.

10.   The IRPs of inmates on the active MH/ID roster in the RTU will be updated upon reception and reviewed every one hundred twenty (120) days by mental health staff and the inmate will have input into the content of the IRP.

11.   Inmates in an RTU will have privileges similar to those afforded to inmates residing in general population unit unless otherwise restricted by the inmate's IRP for clinically-appropriate reasons.

## SECURE RESIDENTIAL TREATMENT UNITS

12.   SRTU housing will be provided to inmates on the active mental health roster who are a threat to the safety and security of staff and other inmates in a less secure environment.

13.   The IRPs of all inmates in the SRTU will be updated by the psychology staff upon reception in the SRTU and at least every thirty (30) days thereafter. The IRP will be reviewed out-of-cell with the SRTU inmate at a minimum of every thirty (30) days and the inmate will have input into the content of the IRP. An inmate's refusal to participate and/or leave his/her cell will be documented.

14.   Each inmate housed in the SRTU will be offered a minimum of twenty (20) hours out-of-cell time per week, consisting of ten (10) hours of Structured Activity and ten (10) hours of Unstructured Activity. If an SRTU inmate's progress in treatment or progress toward the goals of his/her IRP would be enhanced by out-of-cell time in addition to the minimum offered or it would otherwise be clinically appropriate to offer more out-of-cell time than the minimum, DOC will offer additional out-of-cell time. An inmate's refusal of out-of-cell time will be documented.

15.   Pursuant to Department Policy 13.8.1. Section 10, subsection (L), privileges for SRTU inmates are based on a phase system. Movement to a lower treatment phase is based on

appropriate inmate behavior. Inmates moved to lower treatment phases will be granted additional privileges. Inmates that have been moved to Phase 1 will be granted privileges similar to those of a general population inmate.

16. Inmates may be transferred to the SRTU in either AC Status or DC Status. DC status inmates will receive credit on their disciplinary time while housed in the SRTU.

## DIVERSIONARY TREATMENT UNITS

17. SMI inmates currently subject to sanction for a serious disciplinary infraction and on DC Status may be assigned to a DTU. The process for making such an assignment is set forth below.

18. The IRPs of SMI inmates in the DTU will be updated by the psychology staff upon reception in the DTU and at least every thirty (30) days thereafter. The IRP will be reviewed out-of-cell with the DTU inmate at a minimum of every thirty (30) days and the inmate will have input into the content of the IRP.

19. Inmates housed in the DTU will be offered a minimum of twenty (20) hours out-of-cell time, per week which consists of: ten (10) hours of Structured Activity and ten (10) hours of Unstructured Activity. If a DTU inmate's progress in treatment or progress toward the goals of his/her IRP would be enhanced by out-of-cell time in addition to the minimum offered or it would otherwise be clinically appropriate to order more out-of-cell time than the minimum, DOC will offer the additional out-of-cell time.

20. Privileges for inmates in the DTU will be determined by the PRC with input from the PRT.

## DISCIPLINARY PROCESS FOR INMATES WITH SMI

21. If an inmate classified as SMI is charged with a violation of Department rules or regulations, the disciplinary charge will be resolved on an informal or formal basis.

22. DOC may dispose of Class I charges #35 through #46 and Class II charges through informal resolution pursuant to Department policy DC-ADM 801, Section 2. If DOC determines that the alleged misconduct should be referred to the Hearing Examiner for formal resolution, an explanation for this decision will be provided to the Hearing Examiner.

23. If an inmate with SMI is issued a misconduct that will be resolved through the formal process, the Licensed Psychologist Manager (LPM)/designee will receive a copy.

24. Within twenty-four (24) hours, or as soon as normal institutional operations permit, of receipt of a copy of the misconduct issued for an inmate with SMI, a psychology staff member who does not have a current treatment relationship with the inmate will conduct an out-of-cell interview with the inmate, in the most confidential setting possible to assess the inmate. An inmate's refusal to participate and/or leave his or her cell for the interview will be documented. The following findings will be made and reported to the hearing examiner:

   a. whether the inmate is on the D Roster;

   b. the presence of any contraindications for potential placement in the RHU due to the inmate's inability to tolerate such sanctions (which information will only be utilized if a SMI inmate must be placed in RHU under the circumstances set forth herein); and

   c. any other pertinent information obtained during the interview that could inform the decision of the hearing examiner.

25.   If psychology staff determines that the inmate requires an urgent level of treatment, an appropriate referral will be made (e.g., a mental health commitment).

26.   Psychology staff will report findings in writing to the Hearing Examiner for consideration in the disciplinary process.  These officials must consider this information in resolving the matter.

27.   An inmate who engages in Self-harm will not be subject to discipline for that behavior.  Further, there will be no discipline imposed for the possession of or destruction of materials used for Self-harm unless such a sanction is approved by the Hearing Examiner Supervisor.  Prior to approving a sanction for possession of contraband in this context, the Hearing Examiner Supervisor will consult with the Department's Chief Psychologist to determine the appropriateness of any such sanction.

## PLACEMENT OF INMATES WITH SMI IN DC OR AC STATUS DURING THE TRANSITION PERIOD

28.   During the Transition Period, the DOC will house SMI inmates in DC Status and/or AC Status in SRTUs or DTUs to the extent there is capacity.  DOC may place SMI inmates in an RHU in DC or AC status as permitted by Exceptional Circumstances.  When Exceptional Circumstances no longer exist, the inmate will be discharged to an appropriate therapeutic unit within seventy-two (72) hours or as soon as normal institutional operations permit.

29.   Any SMI inmate who is placed in an RHU under the conditions set forth above will be scheduled and offered a minimum of twenty (20) hours of out-of-cell time per week, consisting of at least ten (10) hours of Structured Activity and ten (10) hours of Unstructured Activity.  An inmate's refusal of out-of-cell time will be documented.

30.   Psychology staff will interview and assess each inmate with SMI placed in an RHU within seventy-two (72) hours of initial placement in the RHU or as soon as normal institutional

operations permit and no less than every seven (7) days thereafter. These interviews will be conducted in an out-of-cell area at least once every thirty (30) days, unless such out-of-cell contacts are contraindicated by the inmate's behavior or are refused by the inmate. When psychology staff makes a determination that further placement in the RHU is clinically contraindicated, the inmate will be discharged to an appropriate therapeutic unit within seventy-two (72) hours or as soon as normal institutional operations permit. Reports regarding these interviews and refusals of out-of-cell contact will be documented.

31. An inmate with SMI in AC status who is not released from the RHU within thirty (30) days, will be referred for administrative review of the housing status by the appropriate Regional Deputy Secretary and the Department's Chief Psychologist.

32. The Department will promptly notify the TCC, as defined in Paragraph 56, and Plaintiff's counsel if an inmate with SMI is not released from the RHU within thirty (30) days. The notice shall include detailed reasons for the continued confinement in the RHU.

## EVALUATION OF INMATES WHO HAVE NOT BEEN IDENTIFIED AS HAVING SMI HOUSED IN AN RHU IN EITHER ADMINISTRATIVE CUSTODY OR DISCIPLINARY CUSTODY STATUS

33. Psychology staff will visit the RHU five (5) days per week. The psychology staff will offer an out-of-cell contact with any inmate for whom such contact is warranted in the clinician's professional judgment. The refusal or acceptance of these offers will be documented.

34. Psychology and/or nursing staff will assess each inmate placed in the RHU for suicide potential within twenty-four (24) hours of reception.

35. Psychology staff will personally interview/assess every C Roster inmate within seventy-two (72) hours of initial placement in the RHU or as soon as normal institutional operations permit and no less than every thirty (30) days thereafter. All assessments will be

documented and will address the suitability for continued placement in the RHU based on the staff's clinical judgment, including evidence of any deterioration of the inmate's mental health. These assessments and reports will be the basis for recommendations to be made to the PRC regarding inmates in AC/DC status who are suitable for release. Inmates on the C roster will be offered out-of-cell contacts with Psychology/Psychiatry/PCRNP when such contact is warranted in the clinician's professional judgment, but no less than every ninety (90) days. The refusal and/or acceptance of these offers will be documented. If the inmate's behavior contraindicates out-of-cell contact, the reasons will be documented.

36. Psychology staff will personally interview/assess all A and B Roster inmates within seventy-two (72) hours of initial placement in an RHU or as soon as normal institutional operations permit and not less than every thirty (30) days thereafter. All assessments will be documented and will address the suitability for continued placement in the RHU based on the staff's clinical judgment, including evidence of any deterioration of the inmate's mental health. Psychology staff will make recommendations to the PRC regarding inmates in AC/DC status who may be released. Inmates on the A and B roster will be offered out-of-cell contacts with Psychology/Psychiatry/PCRNP when such contact is warranted in the clinician's professional judgment. The refusal or acceptance of these contact offers will be documented. If the inmate's behavior contraindicates out-of-cell contact, the reasons will be documented.

37. Any non-D Roster inmate confined in the RHU a period of one (1) year shall be given, at a minimum, an annual psychological evaluation, and where indicated, a psychiatric examination during his/her confinement addressing the suitability of continued confinement in the RHU. Interim examinations will be conducted within seventy-two (72) hours when MHP

have knowledge that an inmate is exhibiting symptoms of SMI or when determined otherwise appropriate by psychology staff.

38.    If at any point, DOC determines that an inmate has SMI, the provisions of this Agreement, including those pertaining to screening, IRP development, and placement, pertain to that inmate. An IRP will be developed within seventy-two (72) hours of the determination, and absent Exceptional Circumstances the inmate will be transferred to an appropriate therapeutic unit within another seventy-two (72) hours or as soon as normal institutional operations permit.

## SUICIDE PREVENTION AND USE OF PSYCHIATRIC OBSERVATION CELLS

39.    A psychiatrist/PCRNP will evaluate any inmate who any DOC staff has determined has an elevated risk for suicide to ascertain if the inmate presents with a serious suicide risk requiring immediate placement in MHU or POC and observation by clinical staff.

40.    Inmates determined to have such a serious risk of suicide will initially be placed in the POC under continuous visual contact with written recording of randomly timed observations at least every fifteen (15) minutes. After the initial placement the level of observation will be determined by clinical need and may include the use of continuous video surveillance by a Corrections Officer.

41.    A PRT will be assigned to any inmate psychiatrically admitted to the POC. The PRT will meet within seven (7) days of the inmate's discharge from a POC to discuss present and future interventions. The PRT will update the inmate's IRP based on therapeutic needs and the event that necessitated the psychiatric admission to a POC. Psychology will monitor the inmate's progress for at least thirty (30) days after his/her release from a POC.

42.    The use of the POC should be no longer in duration than necessary to deal with the mental health crisis which caused the inmate to be psychiatrically admitted to a POC. The

Department's goal will be to keep inmates in a POC for no more than seventy-two (72) hours, unless the inmate is not stabilized and awaiting discharge to a Mental Health Unit (MHU) or the Forensic Treatment Center (FTC).

43.   All inmates psychiatrically admitted to a POC will be evaluated daily by psychology staff, excluding weekends and holidays.  Inmates in a POC will also be seen by nursing staff on two shifts, daily.  These contacts will be documented.

44.   Inmates psychiatrically admitted to a POC will be permitted to wear institutional clothing unless such use is clinically contraindicated.  Inmates will not be left without clothing, a suicide smock, or a paper gown.  Use of a paper gown is permitted only when there is a specific safety and security need determined by a mental health professional and will be documented.

45.   A clinical review of each serious suicide attempt and each death by suicide will be completed pursuant to Department Policy 13.1.1. Section 9, subsection (H).

### USE OF FORCE AND RESTRAINTS

46.   If an inmate with SMI presents a non-emergency security threat, an MHP, a person who appropriately trained in Crisis Intervention, or a member of the Hostage Negotiation Team will be notified and that person will attempt to de-escalate the situation so that use of force is not necessary and/or to reduce the level of force required.

47.   If planned use of force is necessitated by the circumstances, DOC will take all reasonable steps to limit the use of mechanical, chemical, or electronic restraints on inmates with SMI.

48.   The restraint chair is not to be used as punishment or as a substitute for mental health interventions.

49.   Prior to placing an SMI inmate in a restraint chair, medical and psychiatric (psychiatrist/PCRNP) clearance must be obtained, unless used in the course of transporting an inmate or when used for medical procedures (e.g. DNA Collection, Court ordered forced feeding, etc.).  If prior clearance cannot be obtained, such as in cases where the inmate's behavior could result in immediate harm to himself/herself or others, then such clearance must be obtained within one (1) hour of placing the inmate in a restraint chair.  An officer will check on the inmate, in person, every fifteen (15) minutes and document and initial his/her observations.  Nursing staff must evaluate and document the circulation and respiratory status of the inmate in the medical record immediately after the inmate is placed in a restraint chair, every two (2) hours thereafter, and at the time the inmate is removed from the restraint chair.  If an inmate has been in a restraint chair for four (4) consecutive hours, the Facility Manager must approve further use, in four (4) hour increments.  If the inmate has been in a restraint chair for eight (8) consecutive hours, a psychiatrist/PCRNP must conduct a face-to-face evaluation of the inmate.

50.   Individualized determinations justifying the use and length of time a restraint chair is used will be fully documented.  The Shift Commander will ensure that all necessary written reports are completed,

51.   In all instances in which an inmate with SMI is placed in a restraint chair, the process of securing the inmate and placing the inmate in the restraint chair, and the entire time period during which the inmate is restrained will be fully video-recorded.  The inmate will be placed in a cell that is equipped with video surveillance and the officer in the control booth will maintain constant surveillance of the inmate through the use of the cell camera.   In the event that any of the portion of the restraint chair placement is not recorded, the Shift Commander/designee will

prepare a written report detailing the reason(s) why the entire placement was not recorded and the report will be provided to the TCC and Plaintiff's counsel.

## TRAINING

52. Every contact Department employee will receive training in suicide prevention in accordance with Department policy 5.1.1.

53. Prior to July 1, 2015 all staff will be required to complete the Department's Mental Health First Aid Training (MHFA). New staff will be trained within thirty (30) days.

54. The Department will continue to provide Crisis Intervention Training (CIT) to staff; those staff members working in units that house inmates with SMI, and those staff members whose job duties require frequent interaction with SMI inmates and issues related to their care will receive priority placement in these classes. By January 1, 2017 the Department will have provided CIT training to one thousand (1,000) staff members.

## STAFFING

55. Staffing of units where inmates with SMI are housed will be adequate to provide appropriate mental health treatment to these inmates and will include sufficient:

    a.   clinical and rehabilitative staff to provide required programming;

    b.   correctional officers to escort inmates to and from treatment activities;

    c.   personnel who are trained to work with inmates who have SMI; and

    d.   personnel to comply with all provisions of this Agreement.

## DESIGNATION OF A TECHNICAL COMPLIANCE CONSULTANT, INDEPENDENT ASSESSMENT AND REPORTING

56. **Technical Compliance Consultant Selection, Authority and Autonomy**

a. The Parties have jointly selected, Kathryn A. Burns, M.D., to serve as the initial Technical Compliance Consultant ("TCC") to assess and report the DOC's implementation of the terms of this Agreement.

b. The TCC will serve for an initial term of two (2) years beginning on the Effective Date. The Parties will then jointly reappoint the same or jointly select a new TCC to serve a subsequent two (2) year term, followed by a one (1) year term for a total of five (5) years or until the termination of this Agreement, whichever occurs first.

c. The TCC may contract or consult with other persons or entities (collectively, "Technical Compliance Team" or "TC Team") to assist in the evaluation of compliance.

d. If a selected TCC is unable to serve or continue serving as the TCC for his/her entire term, the Parties will confer within forty-five (45) days of the notice of the TCC's inability to serve to jointly select a successor. If the Parties are unable to agree upon the selection of a new TCC, each Party will submit two (2) names along with resumes or curriculum vitae and cost proposals to a neutral party selected through the United States District Court for the Middle District of Pennsylvania mediation program. The neutral party will assist the Parties by selecting a TCC from among the names submitted. The Parties agree to equally share the cost of the mediation.

e. The TCC may be terminated for good cause and only with prior notice to, and approval of, the Parties acting jointly. The Parties will confer within forty-five (45) days of termination to jointly select a new TCC. If the Parties are unable to

agree upon the selection of a new TCC, each Party will submit two (2) names along with resumes or curriculum vitae and cost proposals to a neutral party selected through the United States District Court for the Middle District of Pennsylvania mediation program. The neutral party will assist the Parties by selecting a TCC from among the names submitted. The Parties agree to equally share the cost of the mediation.

f. After notice to the other Party, a Party may unilaterally seek to terminate the TCC for good cause by requesting mediation through the United States District Court for the Middle District of Pennsylvania mediation program. The requesting Party will submit a mediation statement to the mediator and to the opposing party and the opposing party will have the opportunity to respond prior to mediation. The mediator will then assist the Parties by deciding if good cause for termination has been established. In the event of a decision that good cause for termination has been established, a new TCC will be selected via the procedure described in this Section.

g. The TC Team is permitted to engage in *ex parte* communications with either Party and any Independent Mediator selected to assist the Parties as described above.

57. **Technical Compliance Consultant Access**

a. The TC Team will have full and complete access to Pennsylvania's prisons and Diagnostic Classifications Centers for the purpose of assessing compliance with the terms of this Agreement.

b. The TC Team will have access to all inmate security/classification records; inmate medical and mental health records; and applicable policies.

c. The TC Team will be permitted to meet with and interview all personnel who work with inmates with SMI/ID, whose duties pertain to the provision of mental health services, or whose work otherwise affects the implementation of the provisions of this Agreement. DOC counsel; the DOC Chief Psychologist and/or Chief Psychiatrist; and DRN counsel may be present during these interviews.

d. The TC Team will be permitted to conduct confidential interviews with inmates.

e. The DOC will encourage all employees and contract staff to fully cooperate with the TCC.

58. **Technical Compliance Consultant Onsite Visits and Reporting**

a. The TC Team will be permitted to conduct up to five (5) days of onsite compliance assessments, four (4) times per year during the term of this Agreement. The TC Team will be permitted to conduct additional onsite visits only if the TC Team's right to access during one of the four (4) onsite visits has been abridged or denied. All onsite visits will take place on specific dates and times mutually agreed upon by the Parties. The projected number of hours per day of each onsite visit will be approximately 8-10 hours.

b. Within forty-five (45) days of the Effective Date, the TC Team will conduct an orientation site visit of a sample of up to seven (7) prisons. Each orientation site visit may take up to one (1) day, limited up to 8-10 hours per day. The TC Team will issue an initial "Compliance Report" one hundred fifty (150) days (5 months) after the Effective Date, and then every six (6) months thereafter. The TCC's

Compliance Report will provide a detailed report of the conditions at the time of the visit, and inform the Parties what information the TCC will require DOC to routinely report and with what frequency as the assessment proceeds. Information to be provided to the TC Team is limited to information reasonably related to the terms and subject matter of this Agreement. DOC will provide requested information to the TC Team and to Plaintiff's counsel within thirty (30) days of the request, with the exception of data or documents requested in conjunction with a site visit for which the DOC will provide at least ten (10) days prior to the site visit.

c. The TCC will provide a draft Compliance Report to the Parties for comment at least thirty (30) days prior to its issuance. The Parties will provide comments, if any, to the TCC within fifteen (15) days of receipt of the draft. The TCC will consider the responses of the Parties and make appropriate changes, if any, before issuing the final Compliance Report for that reporting period.

d. The TCC's reports will describe the steps taken by the DOC to implement this Agreement and evaluate the extent to which the DOC has complied with each substantive provision of the Agreement. Each TCC Compliance Report:

   i. will evaluate the status of compliance for each relevant provision of the Agreement using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance. The TCC will review a sufficient number of pertinent documents and interview a sufficient number of staff and inmates to accurately assess current conditions. The TC Team may also communicate with ex-inmates, family members, and

relevant community members to assist the TCC's assessment of current conditions;

ii. will describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the TCC's findings; and

iii. for each of the provisions in the Agreement the TCC will outline recommended actions for at least the next six (6) months that will assist the DOC toward achieving/maintaining compliance with the particular provision.

e. Nothing in this section prohibits the TCC from issuing interim letters or reports to the Parties should s/he deem it necessary.

59. **Technical Compliance Consultant Limitations**

a. Except as required, authorized by, or as authorized by the Parties acting together, the TC Team will not make any public statements (at a press conference or otherwise) regarding any act or omission of the DOC or its agents, representatives or employees, or disclose information provided to the TC Team pursuant to this Agreement.

b. The TC Team will not testify in any other litigation or proceeding regarding any act or omission of the DOC or any of its agents representatives, or employees related to this Agreement, nor testify regarding any matter or subject that they may have learned as a result of their performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that they may have learned as a result of their performance under this Agreement.

c. Unless such conflict is waived by the Parties, the TC Team will not accept employment or provide consulting services that would present a conflict of interest with their responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against Pennsylvania, its departments, officers, agents or employees. Two years after the termination of this Agreement, the members of the TC Team shall be free to accept employment in cases involving DOC unless DOC can demonstrate by clear and convincing evidence that a conflict of interest exists.

d. The TC Team is not to be considered a State/County or local agency or an agent thereof, and accordingly the records maintained by the TC Team will not be deemed public records subject to public inspection.

e. The DOC is not responsible for the representation or indemnification of the TC Team and does not bear responsibility for any attorney's fees or costs in connection with any suit or claim brought by a third party against the TCC and/or any person or entity employed or otherwise retained by the TCC to assist with fulfilling the duties required by this Agreement.

60. **Technical Compliance Consultant Assistance.** The TC Team will provide the DOC with technical assistance as requested. Technical assistance should be reasonable and should not interfere with the TC Team's ability to assess compliance with the Agreement.

61. **Prohibition Against Retaliation.** The DOC representatives and staff will not retaliate against any person because that person has provided information or assistance related to this Agreement to the TC Team or the Plaintiff.

62. **Confidentiality.** All information obtained by the TC Team will be maintained in a confidential manner. The DOC will not assert physician/patient or psychotherapist/patient privileges with respect monitoring of this Agreement by the TC Team. Within seven (7) days of receipt, the TC Team will distribute to Plaintiff all documents, forms, assessments, and reports submitted by the DOC unless the DOC has already distributed such items to the Plaintiff. The Parties and the TC Team will treat all personally identifiable information obtained pursuant to this Agreement as confidential.

63. **Technical Compliance Consultant Cost and Budget**

   a. The cost of the TCC's fees and expenses will be borne by the DOC pursuant to a reasonable budget to be agreed upon by and between the DOC and the TCC.

   b. The DOC will provide the TCC with a budget sufficient to carry out the responsibilities described in this Agreement.

   c. The TCC will pay for the services of any person or entity employed or otherwise retained by the TCC to assist with fulfilling the duties required by this Agreement out of his/her approved budget.

## AMENDMENTS TO THE AGREEMENT, DISPUTE RESOLUTION AND TERMINATION

64. The Parties may jointly agree to a modification of this Agreement by a written amendment to the Agreement, signed by both Parties.

65. The initial term of this Agreement is three (3) years following the Effective Date, however the term may be reduced by up to one (1) year provided the DOC sustains substantial compliance with all of the material provisions of this Agreement for a period of eighteen (18) consecutive months after the expiration of the Transition Period. The Parties understand and jointly agree that this Agreement will terminate prior to the expiration of the initial term if the

DOC achieves substantial compliance with all of the material provisions of this Agreement for a period of eighteen (18) consecutive months. The term may also be extended by the Court through the equity provisions outlined in Paragraph 69 below.

66. If Plaintiff has a reasonable basis to believe that the Department is in substantial non-compliance with a material provision of this Agreement, Plaintiff will notify the Department in writing of the specific compliance issue(s). This notice will identify, with particularity, the basis of the claim that the Department is not in substantial compliance and the specific material provision of this Agreement that are implicated.

67. Within thirty (30) days of receipt of the notification, the Department will provide a good-faith written response to the Plaintiff's notification with a full factual explanation as to why the Department believes it is in substantial compliance with the specified material provisions, or an explanation of the Department's plans to achieve full compliance with the specified material provision.

68. If the Plaintiff is not satisfied with the Department's response, the Parties will submit the Plaintiff's notice of substantial noncompliance and the Department's response to the TCC. After independently reviewing the notice and response, the TCC will provide the Parties with a detailed report that describes the extent to which the Department has or has not substantially complied with the specified material provision in dispute. If the TCC reports that the Department has not substantially complied with a specified material provision the TCC will outline specific recommendations that will assist the Department toward achieving substantial compliance with the specific material provision in dispute.

69. If the Parties are unable to resolve the dispute within ninety (90) days from the date that the TCC has reported that the DOC is in substantial noncompliance with a material

provision, the Plaintiff may seek intervention from the Court by filing a motion for specific performance of the material provision identified through the aforementioned notice and comment procedure. The Court may order specific performance of the material provision only upon a showing that the Department is in substantial non-compliance with the material provision specified in the notice. The Court may not entertain a motion for contempt and the Court may not grant any remedial relief in the nature of a contempt of court finding against the Department. However, if the Department does not comply with an order for specific performance, the Court may order additional equitable relief, including extending the term of this Agreement in one (1) year increments. In no event may the Court extend the term of this Agreement beyond five (5) years from the Effective Date of this Agreement.

70. The Parties agree that within twenty (20) days of the Effective Date they will sign and submit a joint stipulation of dismissal without prejudice pursuant to Fed.R.Civ.P 41(a). The Parties understand and agree that the Court will maintain jurisdiction of this civil action throughout the duration of this Agreement to enforce the provisions of the Agreement and that the Plaintiff may seek to enforce the Agreement, pursuant to Paragraph 69 above. The Parties also agree that upon termination of this Agreement they will sign and submit a joint stipulation of dismissal with prejudice pursuant to Fed.R.Civ.P. 41(a) thereby ending the Court's jurisdiction over this case.

71. Neither this Agreement nor any policies or procedures referenced herein, shall define any state or federal constitutional rights.

## NOTICE

72. All notices required under this Agreement will be sent overnight mail or overnight courier to the following people:

Disability Rights Network of Pennsylvania
Kelly Darr or Robert W. Meek
1315 Walnut Street, Suite 500
Philadelphia, PA 19107

b. **If to the Defendants:**

Department of Corrections
Office of Chief Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050

## <u>RELEASE AND DISCHARGE</u>

73.  In consideration of the terms and conditions called for herein, the Plaintiff releases and completely and forever discharges the Defendant, the DOC and the Commonwealth of Pennsylvania, their agents, attorneys, servants, representatives, and employees, past and present, and their past, present and future agents, attorneys, servants, representatives, and employees and all other persons with whom any of the former have been, are now or may hereinafter be affiliated, of and from any and all past or present claims, demands, obligations, actions, causes of action, rights, damages, costs, expenses, and any claims for relief or punitive or other damages of any type which have accrued as of the Effective Date of this Agreement, and which relates to the subject matter of this civil action.

74.  Plaintiff hereby acknowledges and agrees that this Release and Discharge set forth above is a general release, and Plaintiff expressly waives any and all claims as set forth above, except of which the Plaintiff does not know or suspect to exist, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would materially affect the Plaintiff's decision to execute this Agreement.

## MISCELLANEOUS PROVISIONS

75. The DOC will make all good faith efforts to secure the necessary funding to implement the terms and conditions of this Agreement.

76. Plaintiff represents and warrants that besides itself, no other person or entity has any interest in the claims, demands or actions referred to in this Agreement, except as otherwise set forth herein; and that they have the sole right and exclusive authority to execute this Agreement.

77. This Agreement contains the entire Agreement between the Parties with regard to the matters set forth herein, and is binding upon and inures to the benefit of the successors and assigns of each throughout the duration of this Agreement.

78. This Agreement will be construed and interpreted with the law of the Commonwealth of Pennsylvania.

79. If, subsequent to the Effective date of this Agreement, any provision or term of this agreement is held to be invalid, illegal, unenforceable or in conflict with the law in any jurisdiction, the validity and legality of the remaining provisions will not be affected or impaired thereby.

80. Any headings or subheadings used herein are for reference purposes only and do not affect the substantive provisions of the Agreement.

81. This Agreement may be executed in counterparts, and a facsimile or .pdf signature shall be deemed to be, and have the same force and effect as, an original signature.

82. Nothing in this Settlement Agreement precludes, diminishes, or restricts any authority granted to DRN as the protection and advocacy system in Pennsylvania for persons with disabilities, including inmates with SMI.

## ATTORNEY'S FEES AND COSTS

83. The Department will pay the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00), in full and complete satisfaction of any and all Plaintiff's claims, including attorney's fees and costs up to the Effective Date of the Agreement. The payment shall be made by checks, payable pursuant to a formula to be provided by the Plaintiff to Defendant within twenty (20) days of the Effective Date and delivered to Robert Meek, 1315 Walnut Street, Suite 500, Philadelphia, PA 19107 within sixty (60) days of the provision of the formula.

84. Nothing in this Settlement Agreement precludes DRN from seeking attorneys' fees and costs for enforcement of the provisions of this Agreement.

**The remainder of the page is intentionally blank.**

DISABILITY RIGHTS NETWORK
OF PENNSYLVANIA

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS

_____
Peri Jude Radicec, CEO
Disability Rights Network of PA

Approved as to form:
Counsel for Plaintiff

_____
Robert W. Meek, Esq.

Kelly L. Darr, Esq.
1315 Walnut St., Suite 500
Philadelphia, PA 19107-4705
(215) 238-8070

Jeffrey M. Skakalski, Esq.
429 Fourth Ave., Suite 701
Pittsburgh, PA 15219
(412) 258-2112

COVINGTON AND BURLING, LLP

David Kornblau, Esq.
Eric Hellerman, Esq.
Mari Bonthuis, Esq.
Michael Formichelli, Esq.
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

KAIRYS RUDOVSKY MESSING AND
FEINBERG, LLP

David Rudovsky, Esq.
718 Arch St., Suite 501S
Philadelphia, PA 19106
(215) 925-4400

PENNSYLVANIA INSTITUTIONAL LAW
PROJECT

Angus R. Love, Esq.
Su Ming Yeh, Esq.

_____
John E. Wetzel
*Secretary, Department of Corrections*

Approved as to form
Counsel for Defendant

_____
Timothy Gates
*Deputy Chief Counsel*

Theron Perez
*Chief Counsel*

Joseph Fulginiti
*Assistant Counsel*

1920 Technology Parkway
Mechanicsburg, PA 17050
(717) 728-7763

OFFICE OF ATTORNEY GENERAL

_____
Maryanne M. Lewis
Strawberry Square 15th Floor
Harrisburg, PA 17101
(717) 787-9719

Barry N. Kramer
21 S. 12th Street, 3rd Floor
Philadelphia, pa 19107
(215) 560-1581

January 5, 2015

DISABILITY RIGHTS NETWORK
OF PENNSYLVANIA

_Peri Jude Radecic_

Peri Jude Radicec, CEO
Disability Rights Network of PA

Approved as to form:
Counsel for Plaintiff

_____

Robert W. Meek, Esq.

Kelly L. Darr, Esq.
1315 Walnut St., Suite 500
Philadelphia, PA 19107-4705
(215) 238-8070

Jeffrey M. Skakalski, Esq.
429 Fourth Ave., Suite 701
Pittsburgh, PA 15219
(412) 258-2112

COVINGTON AND BURLING, LLP

David Kornblau, Esq.
Eric Hellerman, Esq.
Mari Bonthuis, Esq.
Michael Formichelli, Esq.
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

KAIRYS RUDOVSKY MESSING AND
FEINBERG, LLP

David Rudovsky, Esq.
718 Arch St., Suite 501S
Philadelphia, PA 19106
(215) 925-4400

PENNSYLVANIA INSTITUTIONAL LAW
PROJECT

Angus R. Love, Esq.
Su Ming Yeh, Esq.

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS

_____

John E. Wetzel
_Secretary, Department of Corrections_

Approved as to form
Counsel for Defendant

_____

Timothy Gates
_Deputy Chief Counsel_

Theron Perez
_Chief Counsel_

Joseph Fulginiti
_Assistant Counsel_

1920 Technology Parkway
Mechanicsburg, PA 17050
(717) 728-7763

OFFICE OF ATTORNEY GENERAL

_____

Maryanne M. Lewis
Strawberry Square 15th Floor
Harrisburg, PA 17101
(717) 787-9719

Barry N. Kramer
21 S. 12th Street, 3rd Floor
Philadelphia, pa 19107
(215) 560-1581

DISABILITY RIGHTS NETWORK
OF PENNSYLVANIA

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS

_____

Peri Jude Radicec, CEO
Disability Rights Network of PA

John E. Wetzel
*Secretary, Department of Corrections*

Approved as to form:
Counsel for Plaintiff

Approved as to form
Counsel for Defendant

_____

Robert W. Meek, Esq.

Timothy Gates
*Deputy Chief Counsel*

Kelly L. Darr, Esq.
1315 Walnut St., Suite 500
Philadelphia, PA 19107-4705
(215) 238-8070

Theron Perez
*Chief Counsel*

Joseph Fulginiti
*Assistant Counsel*

Jeffrey M. Skakalski, Esq.
429 Fourth Ave., Suite 701
Pittsburgh, PA 15219
(412) 258-2112

1920 Technology Parkway
Mechanicsburg, PA 17050
(717) 728-7763

COVINGTON AND BURLING, LLP

OFFICE OF ATTORNEY GENERAL

_____

David Kornblau, Esq.
Eric Hellerman, Esq.
Mari Bonthuis, Esq.
Michael Formichelli, Esq.
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

Maryanne M. Lewis
Strawberry Square 15th Floor
Harrisburg, PA 17101
(717) 787-9719

Barry N. Kramer
21 S. 12th Street, 3rd Floor
Philadelphia, pa 19107
(215) 560-1581

KAIRYS RUDOVSKY MESSING AND
FEINBERG, LLP

David Rudovsky, Esq.
718 Arch St., Suite 501S
Philadelphia, PA 19106
(215) 925-4400

PENNSYLVANIA INSTITUTIONAL LAW
PROJECT

DISABILITY RIGHTS NETWORK
OF PENNSYLVANIA

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS

_____

Peri Jude Radicec, CEO
Disability Rights Network of PA

_____

John E. Wetzel
*Secretary, Department of Corrections*

Approved as to form:
Counsel for Plaintiff

Approved as to form
Counsel for Defendant

_____

Robert W. Meek, Esq.

_____

Timothy Gates
*Deputy Chief Counsel*

Kelly L. Darr, Esq.
1315 Walnut St., Suite 500
Philadelphia, PA 19107-4705
(215) 238-8070

Theron Perez
*Chief Counsel*

Jeffrey M. Skakalski, Esq.
429 Fourth Ave., Suite 701
Pittsburgh, PA 15219
(412) 258-2112

Joseph Fulginiti
*Assistant Counsel*

1920 Technology Parkway
Mechanicsburg, PA 17050
(717) 728-7763

COVINGTON AND BURLING, LLP

David Kornblau, Esq.
Eric Hellerman, Esq.
Mari Bonthuis, Esq.
Michael Formichelli, Esq.
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

OFFICE OF ATTORNEY GENERAL

Maryanne M. Lewis
Strawberry Square 15th Floor
Harrisburg, PA 17101
(717) 787-9719

KAIRYS RUDOVSKY MESSING AND
FEINBERG, LLP

Barry N. Kramer
21 S. 12th Street, 3rd Floor
Philadelphia, pa 19107
(215) 560-1581

David Rudovsky, Esq.
718 Arch St., Suite 501S
Philadelphia, PA 19106
(215) 925-4400

PENNSY        IA INSTITUTIONAL LAW
PROJEC

Angus R. Lo
Su Ming Yeh,

Angus R. Love, Esq.
Su Ming Yeh, Esq.
718 Arch St., Suite 304S
Philadelphia, PA 19106
(215) 925-2966


AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA

Witold Walczak, Esq.
313 Atwood St.
Pittsburgh, PA 15213
(412) 681-7864